Okay, Mr. Talbot, whenever you're ready. Good morning and may it please the court. The petitioner, Terry Lynn Terry, a prisoner in the Louisiana Department of Corrections is before this court pursuant to a habeas petition, wherein he challenges the sufficiency of the evidence of his Louisiana molestation of a juvenile conviction. The petitioner has been granted a certificate of appealability before this court to raise the sufficiency of evidence as to count three of his state conviction. This court should order the district court to grant the petitioner's habeas petition as to count three because the state court unreasonably applied Jackson v. Virginia in evidence as to count three for two reasons, the state court being the Second Circuit. That's correct. Your Honor. 46 page decision. That's correct. Your Honor. In the record at page 171 and 172, the state court appellate decision on direct appeal addressed the Jackson v. Virginia standard as to count three. And while the state court addressed the correct legal standard under Jackson v. Virginia, which is that viewing the evidence in a light most favorable to the prosecution, could any rational trier of fact find the essential elements of the crime have been proved have been proven beyond a reasonable doubt. And the state court was incorrect in finding that the identity of the petitioner was proven as to count three. The victim in this case never identified the petitioner, Terry Lynn Terry, as the person that she accused of pinching and squeezing her. The state court decision at page 171 made the following incorrect findings that this court should find were objectively unreasonable. The state appeals court found that the victim sufficiently identified defendant to overcome any alleged confusion on the part of the young victim who stated that defendant was the person who did these acts alleged by her. This finding is wrong. In the trial below, the victim who was four years old was given a gingerbread house interview. She was six at the time of trial. That's correct. Her gingerbread house interview occurred when she was four and that interview was introduced at trial. And in her gingerbread house interview, the victim identifies the following person as the person who pinched and squeezed her. She calls them Terry, Terry, Terry. And in the gingerbread house interview, the victim identifies every member of her family as Terry, Terry, Terry. When she's asked who her mother, her father, her siblings are, she responds with the nickname Terry, Terry, Terry, which is very similar to the petitioner's name, which is Terry Lynn Terry. She also identifies the person as her daddy in the gingerbread interview. But she provides no information that would link to the petitioner. So two years later in trial, when the victim is six years old, this is cleared up. The state attorney calls the victim as a witness and does not ask on direct any questions about who she referred to as Terry, Terry, Terry. Instead, the state attorney just introduces the gingerbread house interview. But on redirect, right? You're going to get there. Yes. Yes, Your Honor. So the next thing that happens in the sequence. Go to the cross, and you're right, it's an incredibly difficult identification case. It's circumstantial evidence, but just to give you the hardest facts that would allow a jury, on redirect, she does say daddy's brother, Terry, Terry, Terry, daddy's brother. So I disagree. Okay. So, and this is, you're correct. This page is the most important part of the whole case, right? It's record page 3225. This is the redirect of the state attorney, right? And on the redirect, the state attorney asks, you know, you said your father's name is what? Jonathan. And your mother's name is what? Michelle. Who is Terry, Terry, Terry? And she responds, my daddy's brother. Okay. The next question is, you said in your video that Terry, Terry, Terry was doing certain things to you. Do you remember saying that in your videos? The victim says yes. The state attorney then says, now who do you mean when you said Terry, Terry, Terry? And she says Jonathan. But the second circuit says that was an impossibility, because when the abuse occurred, she was in the, not in her biological father's, right, presence. She was with the defendant. So I disagree. Okay, go ahead. She was in the custody of the petitioner and the petitioner's wife for the, up to two years prior to her being four years old and the allegation being made. But the record below, at pages 3239 and 3243, the government's, the state's own witness testifies that the biological parents would take custody of the children on weekends and that they also, there's some testimony that they saw the children every single day, right? So there certainly is ample evidence in the record to show that the biological father,  And so when the victim repeatedly, during trial. There is evidence that could have led to an acquittal. You've got to make a much higher showing that no rational juror could have discredited Terry when he got on the stand, correct? Because he takes the stand and he denies it. Exactly. I mean, the question I have is why isn't that alone? A juror assessing a defendant who makes an exculpatory statement, their verdict suggests they didn't believe it. Wouldn't that alone support the verdict? I don't think so, your honor. I think that would be impermissible burden shifting. So the defendant, whether he testifies or not, has no burden at all to this. Once he does testify, they're assessing and they could conclude it was a false exculpatory. And I think that's, I think, I mean, I think that's what you have to assume in this case, right? I think giving, you know, due weight to the prosecutor, you have to assume that the jury did not believe Mr. Terry when he testified. But I don't think that answers the question of whether they affirmatively proved the identity of Mr. Terry in their case in chief, right? I mean, they have to meet the... But I guess I'm pushing back thinking that's not what we are doing, double deference to state courts. We're saying, can any rational juror, was the Second Circuit reasonable, concluding that a rational juror might have just seen Terry himself on the stand and say, he's lying? But I, you know, just to push back a little bit, I still don't think that the government ever proved that there's evidence that he's the person she identified. Every time she's asked in trial, who is the person you're talking about on the video who pinched and squeezed you? She says, Jonathan. She uses the name of her biological father every time she's asked that. Did Sister Bandy say that she called the defendant dad? There is evidence that she referred to the petitioner defendant as dad and her biological father. But she uses the name Jonathan in trial, both on cross-examination and redirect. She is asked by... She always does? Yes. It's not dad, did it? Right, right. She used the word... Well, they say, who are you referring to on the video when you say, Terry, Terry, Terry? She says, Jonathan. And they ask you, did you ever call Terry, Terry, Terry dad? And she says, yes. That's the next question after she says that Terry, Terry, Terry is Jonathan. And so, I think if you look at page 3225 of the record, and Your Honor, Mr. Terry was pro se in this case, obviously, throughout the entirety of his post-conviction relief or attempts at relief. And then, of course, this court appointed the federal defender to do the supplemental briefing and argue today. Was there a motion to sever, counts one and two? There was not. No, Your Honor. Last, sort of, you clearly are well-prepared, so I appreciate the responses. But under Louisiana law, wouldn't a jury have been able to use, was it AL? That's right. The count one and count two. Count one's evidence as proof, admissible proof for count three. I think perhaps on the lewd and lascivious claim, right? So when the jury has to make a determination of whether the defendant had the intent to the evidence might be fair game there for the jury to say, there's evidence he did this before, so we could use that to determine whether he did it again. But I don't think so for identity, right? I mean, identity, I think, is a standalone element. This is either the person that the victim is saying committed the molestation or not, and she never identifies the petitioner. And as I reviewed this file, the thing that really stuck out to me, and I tried to make this point in the brief, is when the victim is six years old and testifying on the stand, the petitioner's sitting in the courtroom. And she's never asked if that's the guy she's talking about. And to me, that's telling as a defense lawyer that that doesn't happen, because she's repeatedly saying it's not him, it's Jonathan, it's her biological father. And I think the State probably didn't want that answer, because she was identifying someone other than the petitioner. And the deference here— I'm sorry. When you say repeatedly says it's not him, what's the strongest trial, SB trial statement? It's not that man. So it's when she identifies someone other than— It's the negative inference. It's father did it. It's not that she was directed to him and said no. Right. Right. But, you know, that's a universally used method of identifying a perpetrator, is having the victim—she didn't testify in a separate room, she's in the presence, right? And so, like, that never happens in this case. And so— What does the trial record tell us as to what the closing arguments were before the jury? Sure. With respect to the identity? With respect to identity. Right. So, I mean, the defense lawyer makes a general claim that, you know, that she didn't establish that the petitioner is the person who molested her. The defense lawyer spends a lot of time focusing on the significant other evidence that it wasn't the petitioner. There were about seven witnesses called that also were around the house at the time. The wife, the parents, the sister, the aunt, who all testified that they never saw any evidence of molestation, that he didn't—he worked a lot, those kind of things that we put in the brief. There's a lot of focus on that. But admittedly, a lot of the argument in closing is focused on the other counts, right, where the evidence was much more— But at least—but the point is that the jury's attention was certainly called at the end of trial after all the evidence had been produced. The jury's attention was called to the identification issue and to any conflicting evidence that there may have been. I can't fairly say that it wasn't, Your Honor, you know, certainly. I wish it was brought more to the attention, but that's Monday morning quarterback. But certainly that was a live issue in the trial. And we're not here on an ineffectiveness claim, of course, that the defense lawyer failed to raise something in his closing. But the point, I guess, I hope to leave the court with is that, you know, this is a case where when there was an ambiguous identification of the perpetrator during trial, the victim identified someone other than the petitioner several times by name. And I think this is what habeas relief is for, right? This is the rare case where there's direct evidence by way of the testimony of the victim. So we just sit here as a super jury and decide, hey, that just doesn't seem right. Of course not, Your Honor. There's two levels of deference that Mr. Terry has to get through. But you know, when I cited to the state court decision at 171, the state court says she identified the defendant as the person who did the acts to her. And that's not true in the record. She did not identify the petitioner. She never pointed out a picture. She didn't point him out in the courtroom. She didn't say anything that would link the petitioner to the person that she's calling Terry, Terry, Terry, except for when she's asked who she's referring to, she says Jonathan multiple times. And I think that's, you know, I cited the court to a couple out-of-circuit cases on when evidence, I think, was stronger than the identity evidence in this case. And so, of course, there's two levels of deference, Judge Smith. The state court has to be incorrect in their application of the facts, and that's their statement that he identified her. I think that's an incorrect application of the record to the correct standard of review. But also, you know, this court has to give deference to that. You have to find that that ruling by the Louisiana Second Circuit was objectively unreasonable. And this is the kind of case for that, when the petitioner is not the person who was identified as the perpetrator of the crime. You're not saying Echol Boys, right? That's out of our case law. Right. Right. And so, Your Honor, the second thing I want to focus on here is that the petitioner raises an alternative avenue of relief, and that is that the Louisiana Second Circuit was also objectively unreasonable in finding that there was sufficient evidence that the conduct alleged by the victim here would meet the standard for a lewd and lascivious act under Louisiana state law. And so, in this case, the victim says that the act was squeezing and pinching of her butt and vagina that was not painful. That's the extent of the conduct that the victim testifies to in the Gingerbread House interview. She's never asked about it on the stand, but that's what she says in the Gingerbread House interview. And in my review of the state law on lewd and lascivious, I could not find a case that was in any way analogous or had that limited amount of conduct alleged. The government cites to the Wilson case, and in the Wilson case, there was an 11-year-old victim who testified that her grandfather had digitally penetrated her to the point where she cried and was in pain, and that he also made her sit on his lap where she could feel his parts on her parts. And so that case is not analogous to what we have here. Here under the lewd and lascivious elements, they have to prove that there is some depraved moral or sexual relation or obscene or indecent behavior to lead to the lewd and lascivious act. And here, that... Squeezing vaginas. Well, so, you know, at first glance, that sounds inappropriate, but of course, caretaker's parents have to have contact with their children's genitals for hygiene and other reasons. That's why the lewd and lascivious standard exists. It's meant to take out innocent conduct because parents have to contact their kids' genitals. Like I was saying earlier, we do know what happened to his biological daughter, and that evidence would have been relevant. That's correct. So under lewd and lascivious, there's two standards there, that there's an objective standard about the conduct alleged, and there's a subjective standard about the intent of the defendant. And I think that the propensity evidence, the jury could fairly say, we can infer intent because of his propensity evidence. But I don't think that helps the objective standard, which is, of course, the actual conduct alleged. Thank you, and you've saved time for rebuttal. Thank you, Mr. Talbot. Ms. Edwards. Good morning, Your Honors. May it please the Court, I'm Rebecca Edwards here on behalf of the appellee, Warden Tim Hooper. In reviewing this case, the thought that comes to my mind is that the idea that the state did not meet its burden of proving, in this case, that the victim identified the appellate Terry Terry as the person who molested her is simply implausible on this record. The state presented direct substantive evidence in the form of the Gingerbread interview, where the young child who was four years old, who'd actually just turned four years old, said that her daddy, Terry Terry Terry, came into her bedroom, pinched and squeezed her under her clothes while she was in bed. At that time of her life, the child had lived in the Terry household for two years. Since March 6, 2008, that was when Terry's wife, Jennifer, testified that they took the kids into their household. I remember the Second Circuit focused on that, but his response was the evidence also showed that the biological father kept coming. I think that was a very brief part of the evidence. If I remember correctly, that came from the biological mother, Michelle, and she was not herself the most, didn't seem the most credible, trustworthy of witnesses. I mean, the thing that was kind of sad about the testimony of the biological parents, Michelle and Jonathan, was that they simply did not want Terry prosecuted. They testified they didn't believe their daughter. They believed she was lying. They didn't believe the investigators. They didn't believe the doctor who had examined the little girl. So they, I think, were giving as much as they could to try to show that Terry would not have done that. Is there record evidence of the girl's father staying with her during the time the abuse occurred? Not other than that one reference, no. Okay. Any rational juror could convict, and tell me which of these would suffice, in your opinion, based solely on the fact that Terry took the stand and a juror would have thought he's lying? Did you argue that that alone would suffice? I don't know that that was argued, that that alone was the reason. But under Louisiana law, yes or no? Yes. Okay. What about, I don't think you argued it, but why wouldn't 412.2? Could a juror have convicted on count three simply by virtue of the evidence heard as to count one and two? I think that could have been considered as evidence of lustful disposition towards children. I don't think that would be the sole basis for convicting him because of those counts. Especially here where we did have the child clearly and distinctly explaining what was done to her. And the closest, third question is, the closest that this jury heard her identifying him, is it the redirect statement about Terry, Terry, Terry equals dad's brother? Is that the closest? Well, it was when the, we asked on redirect, did you ever call Terry, Terry, Terry daddy? And she said, yes, she did. So she did at that point say, yes, I did call him daddy before, you know, on her cross-examination is when all this came out about her calling him Jonathan, Terry, Terry, Terry. Now this was a six-year-old girl in a jury trial testifying in front of the judge, in front of a panel of strangers, in front of the family who did not want the appellate prosecuted. She had been back living with her biological parents in those, that ensuing period for those two years where she was, you know, we don't know what pressure she was under. We have a six-year-old girl in a trial facing all these people trying to answer questions. And she came up with, I think, what they probably wanted her to say, that it was Jonathan. And that was wholly implausible when you look at the evidence in the record that she was not with Jonathan at the time that the molestation occurred. She was living in the Terry household from the time she was about two years old until four. Well, then what about his comment, just your acknowledgment right there that she came up with it being Jonathan? He's saying the Second Circuit, therefore, was clearly erroneous when it said she identified the petitioner. If you're saying you essentially agree. Excuse me, Your Honor. I'm sorry. They based the identification, I think, on the Gingerbread House. The jury had before it what the child said initially in the Gingerbread House video, which was at the time that she had been living in the Terry household for those two years. Those were her parents at that time. Terry, his wife, and her little brother lived there as well. She never mentions anything at all in that video about Jonathan, never says her daddy is Jonathan Terry, Terry, Terry. It's always Terry, Terry, Terry, my daddy, who did this. When she makes reference to people being Terry, Terry, Terry, I think when you look closely at it, she's talking about people in that household where she was living with the appellant, with his wife, with her little brother. When she's asked about who brought you to the interview, who's with you here today, she says my Mama Michelle. She never identifies her biological mother as Terry, Terry, Terry, as she does the other members of the family who she was living with at the time. Can you isolate or identify what trial testimony there was that definitively referred to Petitioner Defendant as Terry, Terry, Terry? Referring to him other than the little girl, from what I recall, is the only one who referred to him as Terry, Terry, Terry. So in her trial testimony, on direct examination, she watched the video, she testified that everything she said in it was true. When she gets to cross-examination, and I believe this is when the defense counsel asks the name of her father, and she says Jonathan, Terry, Terry, Terry. And then they go through all these questions about, well, who's your dad, who's your mom, and she's saying Jonathan and Michelle, which at that time, well, they were the biological parents, but also at that time, she had been living with them for two years, and during that period, they were her only parents, and like when she was younger, at the time the molestation was occurring, when the parents who were raising the two-year-old were the appellant and his wife. So I think, you know, when you look at that, you look at the fact of, you know, where they lived, and one thing she was clear about in the gingerbread video, that the molestation happened in both places, and she specifically specified Mississippi, where they had lived for two months. And from Terry's own testimony, he, his wife, and the two children were alone in Mississippi during that two-month period. So if the jury wants to believe that the child was actually molested, that this happened in Mississippi, the only person who could have done it was Terry, Terry the appellant. So if they also believe that, yes, this additionally happened in Louisiana, that it was an ongoing thing, and the family had lived in Louisiana, then the person who did it likewise would have been Terry, not Jonathan, who was not really involved in her life, other than, according to the mother, these occasional visits. The petitioner's full name is what? Terry Lynn Terry. Terry Lynn Terry. That's his name. And what's the biological father's full name? Jonathan Barger, Barger, I believe. So he is, to my knowledge, no Terry at all in his name. And he... The Supreme Court, there was a dissent, but no explanation? No, it was just, I believe, would have granted writs, and I'm not sure, nothing indicated on what issue. He gets 50 years on count three? 50 years, 25 without benefits, because of the age of the child. Oh, that's what it was. Yes. I see. That's the reason for that significant sentence, compared to the sentences for the two adult... There was never a motion to sever. Pardon me? I asked opposing counsel, there was no motion to sever, counts one and two. Counts one, the evidence is so graphic and powerful, totally separate. Yes. Not that I recall. Okay. No motion to sever. But that's, I mean, I just think it's implausible based on the evidence, the fact she was living with him, that where she said it occurred, I think the jury made a reasonable determination. They saw the little girl on the stand, they saw her testify, and they could assess whether she was scared, which she said she was. They could assess her demeanor. They also watched her in the gingerbread video, and they saw the other witnesses who took the stand and testified at trial. They did what we ask juries to do, to make a credibility determination, to weigh the evidence, to reconcile any inconsistencies in the testimony. That's exactly what was done here, and we know that on federal habeas review and applying Jackson and under the standards of Section 2254, those are generally beyond the scope of review. The courts are to give deference and double deference in this case, where you're considering the Jackson v. Virginia standard, where the evidence is viewed in the light most favorable to the prosecution, as well as under 28 U.S.C. 2254 as well. This is, you know, looking at all of that, the jury had ample evidence before it to reach the decision it did. The Court of Appeals, the Second Circuit Court of Appeals, did an extremely thorough review of the testimony and the evidence, and they found that it was sufficient, and they, you know, as I stated, pointed to the gingerbread video as the basis for the child identifying the appellant as the person who molested her. And there was also some corroborating medical testimony as well from Dr. Ann Springer, who had examined the child the same day as the initial gingerbread video interview, and her testimony, she couldn't say definitively that the child was or was not molested when she found corroborated what the child said had happened to her, showing the different injuries and the general neglect of the child at that time. So basically, that's the case for the identification of Terry Terry. The jury had this evidence before it and could make that determination. There was ample evidence for it to find that the little girl did identify him, and to reject the trial testimony where she was trying to claim she meant Jonathan Terry Terry when there was nothing indicating she ever called her biological father Terry Terry Terry. Regarding the allegation that the pinching and squeezing of the young girl's butt and I just don't understand that argument at all. It was something that she said he came into her bedroom at night, put his hand under her clothes and did this multiple times. He gave no excuse for it. He simply denied ever doing this. There's no innocent explanation on the record for such actions. There's none that I can think of. There wasn't any evidence that he was treating some kind of condition that he was trying to, you know, clean or some hygienic purpose. It wasn't inadvertent. It wasn't accidental. If it was done more than one time, this was very intentional. And it's also strikingly similar to what his oldest daughter, the way she testified and explained her earliest memories of how he began molesting her. It's the same type of situation that, you know, he appeared to be trying to groom this little girl and only thanks to his older daughter's finding out that he had this small child in his custody that they were able to, you know, step up, finally bring charges for themselves and get this investigated. And this all came about in about a three-day period from when the Caddo Parish sheriffs were contacted by his oldest daughter until the little girl was back in Louisiana being interviewed at the Gingerbread House. So it was a very quick series of events. The state, this is not a case where habeas corpus relief should be granted. The great red issues were there are extreme malfunctions in the state criminal justice system. This is not such a case. This is a case where the jury had a lot of evidence before it. The jury weighed the evidence. The jury made a credibility determination. They found that this little girl sufficiently identified the appellant as Terry, Terry, Terry, her daddy, who she had spent the first, you know, ages two to four with and the person she identified who had the opportunity and access to come in and to molest her. And unless the court has any further questions, I would cede the remainder of my time. Thank you, Ms. Edwards. Thank you, Your Honors. Mr. Talbot for rebuttal. Thank you, Your Honors. Just briefly, the petitioner is not asking this court to reweigh the evidence, not asking the court to resolve inconsistencies in testimony or make credibility determinations. The question is, did the victim ever identify the petitioner? So this isn't a case where the victim identified her uncle in one interview and identified her dad in another interview and we're asking you to reweigh. There's no reweighing here. She never identifies the petitioner, Terry Lynn Terry, as the person who pinched and squeezed her. And so, but she does affirmatively identify her father. And as I pointed out in the record, page 3239 and 3243, the state's own witness testified that the parents had access to her, that they took her for the weekend. So that would mean she's staying the night with her parents. So that would, could explain someone coming into her room at night, right? So there is an explanation that shows that the father, Jonathan, had access to her. And so, you know, when she's identifying the father, when he has access to her and she never identifies the petitioner, under those extraordinary facts, no rational trier fact should have found the defendant guilty. Besides the identification testimony, Ms. Edwards mentioned Dr. Springer, you know, the LSU pediatrician who provided some medical testimony. Did your client present any medical evidence to rebut her evidence at trial? There was no rebuttal of that. But on identity, I don't think Dr. Springer's testimony is relevant because she can't say who did it, right? If the father, Jonathan, is the perpetrator, then her, you know, the jury could have accepted her testimony on face value and given her a credibility determination that this court doesn't have to disturb. And so I think, you know, while that certainly could be relevant in the lewd and lascivious argument that Mr. Terry has raised, I don't think it's relevant for identity. And so, Your Honor, in, you know, I'll end with this. You know, the habeas corpus is the extraordinary writ, right? It is a rare grant for this court to do that. But I will tell you that in reviewing this case and looking at the testimony at page 3225, this is the case for that. This is a case where I believe that the petitioner is in the Louisiana Department of Corrections on count three for something that was not proven on this record, and I don't think it's debatable. And so I ask the court to grant, to order the district court to grant the petitioner's habeas petition as to count three. Thank you for your time, Your Honors. Thank you, Mr. Talbot. Your case is under submission. Next case, Garcia-Garcia.